# EXHIBIT

## "T"

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

---

In the Matter of the Arbitration between

Pravati Credit Fund III LP, a Delaware limited
Partnership

-vs-                                              Case Number: 01-20-0000-4648

The Williams L.G., P.L.L.C. d/b/a The
Williams Law Group PLLC; and Andrew Williams

---

### INTERIM AWARD OF ARBITRATOR

I, Janet S. Weinstein, having been designated in accordance with the arbitration agreement entered into between the above-named parties on October 31, 2018, having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby issue this INTERIM AWARD, as follows:

### FACTUAL FINDINGS AND PROCEDURAL BACKGROUND

1.      The Williams Law Group, PLLC, ("WLG") is a law firm located in Miami, Florida that primarily represents plaintiffs in litigation on a contingency fee basis.  Andrew Williams ("Williams") is the sole owner and principal of WLG. Pravati Credit Fund III LP ("Pravati" or "Claimant"), is an investment fund that provides loans to law firms, typically law firms that represents its clients on a contingency fee arrangement and, consequently, may have an uneven cash flow.  Pravati provides funding to assist law firms with upfront litigation costs and expenses, such as expert studies or fees, as well as to pay other operating expenses of the law firm.

2.      Pravati had a process for considering and approving a law firm's request for finding. The law firm was required to provide certain information for Pravati's consideration, including without limitation financial statements, a description of the law firm's practice and a listing of the firm's active cases, which usually included a short description of the matter, the case number with the venue/court in which the case was pending or about to be filed, the fee arrangement for the case, which was usually a contingent fee, and the percentage contingency to be paid to the law firm.  After a review of the list and other information provided and discussed by the parties, Pravati prepared a term sheet.  Once a term sheet was executed, Pravati performed due diligence, which was described as a "deep dive" into the listed cases,

engagement letters, case dockets, case status and discovery.  Pravati requested disclosure of information about the law firm attorneys and any adverse information about the individual attorneys involved in the cases, such as attorney conduct issues, criminal issues or any significant litigation in which an attorney was involved personally, perhaps even a divorce proceeding.   Pravati determined whether the issued disclosed were of a minor concern or resolved, in which case it did not necessarily foreclose a funding arrangement.  When due diligence process was completed, Pravati would send the funding agreement and documentation to the law firm.

3.      In or about July 2017, Williams and Pravati first communicated about the possibility of Pravati providing funding of $50,000 to $100,000 to WLG.     The parties communicated about the possibility of funding but did not progress after approximately October 2017.

4.      In the summer of 2018, Williams contacted Pravati to resume their discussions about funding for WLG. Williams communicated that he had been keeping busy with his law practice and had a strong portfolio of new cases.  He explained that he was seeking funding of $150,000, primarily to pay expert witness fees for his cases.  William gave Pravati a July 25, 2018 WLG case list that categorized cases coded in white as "newer"; cases coded in red as "in litigation"; cases coded in grey as "resolved"; and cases in which a demand letter had been sent, coded in green.  Williams represented that he estimated the value of the listed cases at $5,552,500.

5.      On August 23, 2018 a term sheet was prepared by Pravati and delivered to Williams.  The parties negotiated a term sheet, and ultimately signed a term sheet on October 10, 2018.   On October 31, 2018, Pravati and WLG entered into a Law Firm Legal Funding Contract & Security Agreement ("Funding Agreement").   On the same day, Williams executed a Limited Guarantee Agreement, annexed to the Funding Agreement as Schedule "E," pursuant to which he agreed to guarantee unconditionally the performance of certain WLG obligations under the Funding Agreement.

6.      The Funding Agreement provided that Pravati had lien against the fees to be received by WLG for all cases in which WLG was representing clients in litigation, including but not limited to the cases identified in the list provided by WLG, as well as any other cases (such as hourly rate cases that may not have been included on the list), and all new cases being handled by WLG, until the amounts due from WLG under the Funding Agreement were repaid in full. Unless there was a default under the Funding Agreement, the loan was non-recourse as to WLG, but all of the law firm's revenue and earnings from all

present and future cases were security for and a source of repayment of the amount owed under the Funding Agreement to Pravati. The Funding Agreement required that all settlement payments, recoveries or judgment payments from defendants in cases where WLG was representing the plaintiff was required to be deposited into WLG's client trust account.   By way of background, typically when a lawsuit is settled or when a judgment is collected or paid by a defendant to a successful plaintiff, the defendant remits the settlement payment to the plaintiff by delivering the funds to the client trust account of the plaintiff's attorney.[1]  The repayment terms under the Funding Agreement provided that WLG would make payments to Pravati promptly upon WLG's receipt of its fees.  Repayment was to be made to Pravati in the amount of 50% of the fees received by WLG, and was to be paid to Pravati no later than concurrently with the distribution to WLG of its 50% share of the fees. The Funding Agreement also provided that upon a default by WLG in the performance of the Funding Agreement, the percentage of WLG's fees received to be paid to Pravati would be increased from 50% to either 75% or 100%, depending upon the nature of the default.

7.      The Funding Agreement required WLG to submit information records and reports to Pravati periodically, or upon request including:  (1) monthly reports to Pravati detailing the status of all WLG's cases within ten days of the end of each month; (2) copies of all WLG and "related bank statements" and trust accounts for each month that funding is outstanding under the Funding Agreement within fourteen (14) days of any request by Pravati; and, (3) information and case files sufficient to allow Pravati to perform an audit of any case being handled by WLG, within 72 hours after request by Pravati.

8.      Under the terms of the Funding Agreement the total amount funded to WLG was $216,000 and accrued interest at the rate of 1.35 % per month until paid in full.   The $216,000 loan to WLG was allocated as follows:

---

[1] After the sum paid by the defendants is deposited into a law firm's client trust account, there is a prompt determination of how the monies are to be paid out and distributed. In some cases, if the law firm's client was injured and had medical treatment that was not paid for, there might be medical liens that the plaintiff's attorney may negotiate and resolve, in which case some of the monies paid by the defendants will be distributed from the client trust account to pay medical liens of the client, or other unpaid costs of litigation.  Once all of the expenses and liens related to the client and the litigation are determined, the monies are distributed from the attorney's trust account, including payment of fee to the attorney from the client trust account to the law firm's operating account and payment to the client of the settlement proceeds.

a.   $150,000 remitted to WLG, to be used for law firm operation costs, refinance existing law firm debt incurred for law for operations, pay taxes; arm's length loans, or distributions to law firm principals not to exceed $25,000, so long as the law firm is not insolvent at the time that any such distribution is made.

b.   $19,500 funded for WLG's fees paid to Pravati for loan origination, due diligence and legal document preparation fees in connection with the loan;

c.   $46,800, which represents an estimate of 24 months of interest due on the loan, to be placed in a reserve account for the payment of periodic interest due from WLG to Pravati on the loan.

9.   On or about November 2, 2018 wiring instructions were processed for $150,000.00 to be deposited into the operating account of WLG at Chase bank account No. XXXX620.

10.   In January 2019, by email to Williams, Pravati requested that WLG send copies of the WLG's December 2018 bank statements for its operating and client trust accounts, and noted that Pravati would be requesting those account statements be sent to Pravati each month going forward.   Pravati sent emails in February and March 2019 requesting copies of WLG's monthly bank statements, stating that none had been received from December 2019 through the date of the email.   In addition, as of that time, Respondents had not provided to Pravati any reporting on the status of any matters WLG was litigating on behalf of its clients; if there had been any new developments, adverse or otherwise; or if any of matter settled.

11.   Pravati expected WLG to submit monthly reports concerning the status of all WLG cases with updated substantive discussion of the cases, disclosing any noteworthy developments positive or negative, and stating if the matter had settled not only because WLG was required to do so under the Funding Agreement, but because the Funding Agreement did not impose a payment structure with specific dates or timeframes.   Accordingly, the only means by which Pravati would know if WLG was in compliance with the repayment terms of the Funding Agreement was if WLG met its duty to timely report as required by the Funding Agreement.   Pravati's interest under the Funding Agreement, and its ability to protect its interests and rights under the Funding Agreement was largely, if not, completely, dependent upon WLG's accurately, timely and prompt reporting.

12.   Pravati initiated communication with Williams multiple times from January through July

4

2019, by email and by phone, requesting WLG to provide case reports and monthly bank statements for WLG's operating and client trust accounts. Paolo Chen, who worked in the accounting area at Pravati and was assigned to the WLG loan, spoke with Williams by phone and sent regular emails to Williams starting in March 2019 to reiterate requests for monthly bank statements and the monthly case update reporting. On July 1, 2019, Mr. Chen again requested WLG operating and IOLTA (trust account) bank statements for December through June 2019, and on July 8 2019 emailed Williams: "I'm following up again on our request on bank statements and case updates. In addition, we still have not received your payments on the settled cases. Please provide an update." As of Mr. Chen's July 8, 2019 email, Pravati had not received any payment from WLG under the Funding Agreement, status reports or bank statements.

13.    On July 17, 2019, Pravati sent letters to WLG and to Williams as Guarantor  The letter to WLG notifying its of defaults under the Funding Agreement, noting breach of the obligations under Section 2 (iv)  of the Funding Agreement, for WLG's failure to timely remit to Pravati its share of the Proceeds received by WLG; Section 2 (vi), WLG's failure to timely and promptly make or remit any payment in accordance with the Funding Agreement; and Section 2 (xiv), for WLG's breach of its obligation to deliver mandatory case updates and WLG financial statements in violation of Section 8 of the Funding Agreement. The letter to Williams demanded payment from him as guarantor pursuant to Exhibit "E" of the Funding Agreement, specifically demanding the outstanding balance owing from WLG under the Funding Agreement at that time, of $204,002.10.

14.    The day after the notice of default and demand for payment letters were delivered by email to Respondents, Williams responded to Paolo Chen's July 8, 2019 email, to advise Mr. Chen that he had not responded earlier because he had been "out with a medical issue."

15.    On July 26, 2019, Williams sent an email to Pravati, referring to a conversation he had with Mr. Chen on July 24, 2019, stating that checks were already in the mail to Pravati, and reiterating that the bank account statements would be sent to Pravati early the following week.

16.    On July 30 2019, Pravati received checks referencing the "Antoine" and "Brown" cases. Shortly thereafter, Pravati received three cashier's checks dated August 5, 2019, specifically, a check for $1250.00 referencing "Hamill"; a check for $1666.66 referencing "Vasquez"; and a check for $ 10,833.33

referencing "Wright."[2]   It is noteworthy that cashier's checks were purchased as opposed to the checks being issued from WLG's Operating or IOLTA account.

17.      On July 31, 2019, Williams sent the WLG Chase Bank trust/IOLTA statements, Account XXXX 715, for December 2018 through June 2019 to Pravati, but still did not send the November 2018 IOLTA bank statement and had not sent any updated reporting on the cases being litigated by WLG or the monthly operating bank account statements.   On August 30, 2019, Williams sent an email to Mr. Chen attaching WLG's operating statements for December 2018 through July 2019, but did not send the July 2019 IOLTA trust account statement.   This was the first time that Bank statements for WLG's operating bank account at Chase Bank, Account XXXX 620, were provided to Pravati since the execution of the Funding Agreement.

18.      WLG did not remit any other payments to Pravati, furnish any bank statements, or send case update reports to Pravati from September 2019 through early December 2019.

19.      In November 2019, Williams contacted Mr. Chen by email requesting a telephone conference the same day or that week.   When they spoke in early December, Williams communicated that he was interested in obtaining additional funding for an important matter in federal court in California, the Thompson case.   He stated that he needed additional funding for expert witness fees.   After the conversation, Williams sent Chen an updated case list that included new cases being handled by WLG as of December 3, 2019, and copies of some, but not all outstanding bank account statements from August through November 2019.   In the email, Williams noted that several of the cases on the list have been settled, but that WLG had not remitted payment to Pravati yet because many of the settlements are subject to a lien.   There is no information identifying which cases were subject to a lien, the identity of the lienholder, the type of lien, the amount of the lien or other details.   On December 4, 2019, Mr. Chen sent Williams an email asking if he was available to discuss the bank account statements, and later the same day Williams emailed additional WLG operating account and other bank statements to Mr. Chen.

---

[2] The July 25, 2018 case list attached to the Funding Agreement as Schedule B, listed the Hamill case with an estimated case value of $20,000 and a contingent fee of 33%, and listed the Wright case with an estimated case value of $125,000. Because WLG remitted $1250.00 to Pravati for the Hamill matter, which under the Funding Agreement was 50% of the fee earned for that matter by the WLG, then (assuming WLG indeed remitted 50% of its fee) WLG earned a total fee of $2500 for the Hamill case, and a total recovery of $7500. Based upon the same analysis, Wright settled for $65,000.

20.     The documents Williams sent to Pravati in late 2019 in connection with Williams's request for additional funding for WLG included bank statements from a Chase bank account No. XXXX815 for an entity named the "Williams Marketing Group LLC."   Prior to this point, Williams had not disclosed this entity to Pravati, and Pravati was unaware of the entity or its relationship to WLG.   The bank statements for WLG and the marketing entity reflected transfers between the accounts in various amounts and at various times, including, for example, an October 2019 transfer from the WLG operating account to the Williams Marketing Group in the amount of $20,000.

21.     After Pravati received some additional bank statements[3] and the updated case list in December 2019, Pravati communicated to Williams that it would require a more detailed updated case list that included all matters being handled by WLG, an explanation for reporting delinquencies to date, and more specific information pertaining to the default judgment in the Thompson case. Williams expressed that his need for the additional funding was urgent, in particular, because a hearing was set for January 7, 2020, and that the funds were needed in order to retain an expert to testify at that hearing.  On December 23, 2020 Williams sent an email with attachment including an updated case list, information about the Thompson case and a letter dated December 21, 2019 responding to Neal's request.  The December 21, 2019 letter explained that Williams was distracted for a period of time in 2019 because there was concern that he had lung cancer and he was undergoing medical testing and evaluation that prevented him from diligently responding to requests.

22.      The December 23, 20219 list identified more cases than on the list provided a few weeks earlier, but the December 23, 2019 case list did not include sufficient detail and information from which Pravati could make any determination about additional funding for WLG, but was used as a starting point from which Pravati would ask a litany of other questions.

23.     As of late 2019 and early 2020, the parties communicated further about WLG's request for additional funding and the status of payment for the cases being settled.  Pravati did not move forward with WLG's additional funding request and in February 2020, initiated this arbitration.

24.     On February 10, 2020, in accordance with paragraph 18 of the Funding Agreement, Pravati filed with the American Arbitration Association ("AAA") a Demand for Arbitration pursuant to the AAA

---

[3] WLG never provided IOLTA trust account bank statement for the months of November 2019 or July 2019 to Pravati.

Commercial Arbitration Rules against WLG and Williams (collectively "Respondents"), asserting claims of Breach of Contract; Breach of the implied warranty of good faith and fair dealing; conversion; Fraud; Appointment of a receiver/examiner; full accounting; imposition of constructive trust; and unjust enrichment.[4]  In addition, the Demand requests attorneys' fees, pre and post judgment interest pursuant to A.R.S. 44-1201, arbitration costs and punitive/exemplary damages.  Respondents did not file an answer or counterclaim, but asserted a jurisdictional objection to the arbitration, which was decided by the undersigned in written order issued in this matter.  The jurisdiction objection was denied on the merits and because the assertion of the objection to jurisdiction was untimely.  Respondents assert that their appearance and participation in the arbitration proceeding remains subject to their jurisdictional objection.

25.     Pre-hearing proceedings in the above referenced arbitration involved active participation by both parties, the assertion of objections and motion practice, as reflected in the record filings, and Order Nos. 1 – 11 issued by the undersigned, and by this reference, incorporated herein. The Arbitration hearing was scheduled to be held November 9 through 13, 2020. On the morning of November 9, 2020, less than an hour prior to the commencement of the hearing, Williams sent an email to Claimant and the undersigned stating that he was admitted to the hospital earlier, and that he would advise further once he was released from the hospital.   Despite efforts to communicate with Williams by the AAA and the undersign by several means, there was no further communication from him until late in the week,[5] shortly after the undersigned sent an email to the parties and the AAA confirming that the remaining scheduled days of arbitration would be canceled and rescheduled to another date.   Williams attempted to delay the rescheduling of the arbitration hearing, by stating that he was no longer available for a brief conference call to select new dates for the hearing, despite that the conference was scheduled by the arbitrator based on Williams having previously communicated his availability at that date and time. Ultimately, the arbitration was held on February 1 and 3, 2021, at which time testimony, documentary evidence and argument of counsel was presented, in accordance with the Orders issued by the undersigned.

---

[4] The claims for appointment of a receiver, full accounting and imposition of a constructive trust appear to have been abandoned by the Claimant.  However, in any event, it is found that there is a lack of evidence to support these claims and they are hereby denied.

[5] Williams explained that there was concern he was having a stroke, and that he was relieved to learn that he had not had a stroke.

## LEGAL ANALYSIS

### Breach of Contract

26.     To state a claim for breach of contract, Claimant must establish by a preponderance of evidence the existence of a contract, breach of the contract, and resulting damages. *See First Am. Title Ins. Co. v. Johnson Bank*, 239 Ariz. 348, 353, ¶ 22 (App. 2016).   It is found that Pravati has established all three elements of the claim.   There is no dispute that the Funding Agreement was entered into by the parties and that Pravati funded over $216,000, and delivered to $150,000 to WLG subject to the terms of the Funding Agreement.  WLG breached of the Funding Agreement as detailed below.

27.     First, WLG completely failed to submit the required monthly reporting about its cases for more than a year, and only submitted "bare bones" updated case reports after WLG requested that Pravati advance additional funding.   Multiple and ongoing requests were made by Pravati to WLG under paragraph 8 of the Funding Agreement for "copies of all related bank statements and trust accounts for each month that legal funding is outstanding[.]" Williams, on behalf of WLG, ignored delayed and deflected those requests for more than six months, until the July 2019 letters from Pravati giving notice of default to WLG in default under the Funding Agreement and to Williams under the Guaranty were served.

28.     By failing to comply with the reporting requirements of paragraph 8 of the Funding Agreement, WLG defaulted under paragraph 2(xiv) and did not cure the default.  Williams never provided "all of the related bank statements" to Pravati within thirty (30) days of the notice of default.  The monthly IOLTA bank account statements for December 2018 through July 2019 were sent to Pravati on July 31, 2019, but WLG never provided November 2018 or July 2019 IOLTA bank statements.  WLG waited until August 30, 2019 to send Pravati the WLG operating account statements.  WLG and Williams did not thereafter continue to send the monthly statements as requested.  Additional bank statements were sent to Pravati in late 2019, only after WLG sought more financing from Pravati.  At that time, Respondents also sent Pravati bank statements for an entity previously unknown to Pravati called "Williams Marketing Group" (Account No. XXXX5815).    After reviewing the bank statements submitted into in evidence carefully, and in detail, the undersigned finds that the numerous transfers between the operating, IOLTA and Marketing group bank accounts establishes them as "related" accounts under the terms of the Funding Agreement.  The bank statements that were provided to Pravati reflect additional transfers to and from the WLG operating and IOLTA accounts involving additional unidentified Chase Checking Accounts No.

9

XXXX 215, XXXX 285 and XXXX 653.  None of those accounts were identified by WLG to Pravati. Based upon the frequency and regularity of the transfers between these unidentified accounts and the WLG operating and IOLTA accounts, the undersigned finds that these bank accounts were also "related" accounts under the terms of the Funding Agreement and the monthly bank statements for these accounts were required to be provided to Pravati upon request in accordance with paragraph 8 of the Funding Agreement.  The failure of WLG to furnish these statements when requested constitutes breaches of the Funding Agreement.

29.     Pravati was damaged by the WLG's reporting breaches of the Funding Agreement because the prompt and accurate reporting of the status of the cases and bank statements reflecting monies received by WLG, the use of the amounts funded by Pravati, and the financial condition of WLG is the primary means by which Pravati can determine whether WLG is in compliance with the Funding Agreement and protect and enforce its rights.   Pravati is entitled to increase the percentage of the fees collected by WLG from 50% to either 75% or 100% upon certain events.  However, Pravati's ability to invoke those rights were undermine and thwarted by the WLG's breach of the reporting requirements under the Funding Agreement.   Moreover, the Funding Agreement expressly provides that Pravati may place WLG in default and thereafter have recourse against the law firm and the guarantor upon an uncured breach of paragraph 8 of the Funding Agreement.    WLG's reporting breaches worked to deprive Pravati of the benefits it bargained for, its rights under the Funding Agreement, and to delay and thwart Pravati from receiving or seeking the repayment of the loan made pursuant to the Funding Agreement.

30.     WLG also breached the Funding Agreement by failing to deposit all fees, settlement payments and other payments for the cases in the IOLTA account, and by failing to timely and fully remit 50% of the fees received by WLG, as required by the Funding Agreement.   If WLG did not default in making payments under the Funding Agreement, it means that from the inception of the Funding Agreement through December 31, 2019, a period of over a year, WLG earned a total of \$33,333.30[6] in fee income, because it paid Pravati only \$16,666.65 (50% of \$33,333.30), over that time period.   The undersigned finds that the evidence supports an inference that WLG earned in excess of \$33,000 of fee income in the thirteen (13) months from December 2018 through December 2019.

---

[6] Payment on 7.29.19 of \$1250 and \$1666.66, and three cashier's check dated August 5, 2019 in the total amount of 13,749.00.

Although the $150,000 loan from Pravati was transferred into the WLG operating account in November 2018, the balance of that account was nearly zero by December 31, 2018. In 2019, with a balance of nearly zero in the operating account at the start of the year, there was more than $35,000 in withdrawals, bank fees or monies paid out to merchants and other parties from the WLG operating account. Moreover, the records show during this period of time there deposits were made to the Marketing Group bank account from unidentified sources, such as a $25,000 deposit on October 10, 2019.

The only payments made by WLG to Pravati in 2019 were on July 24 and August 5, 2019, which mean that WLG did not receive any other fees during the other months of 2019. However, in 2017 WLG received gross income of over $114,000, and received fees in ten out of twelve of months, as reflected on the WLG 2018 P & L report.[7]

There are corresponding transactions, transfers of funds and payments in and between the bank accounts that, in the absence of any other feasible explanation, appear to represent the receipt of settlement funds and payment of fees to WLG, but no corresponding payment to Pravati. For example, on February 26, 2019, a deposit of $7,500 was made to the IOLTA account. On February 28, 2019, the sum of $4988.12 was transferred from the IOLTA account to the WLG operating account. The same day an electronic payment through Zelle was transmitted from the WLG operating account to an individual named Marveetes Brown in the amount of $4,988.12. The case list attached to the Funding Agreement includes a case for "Brown" estimated to be worth $50,000, with a fee to WLG of 33%. The sum of $4988.12 paid to Marveetes Brown is approximately 67% of $7,500. The difference of the $7,500 received into the IOLTA account and the $4988.12 paid to the client was $2511.88, approximately the 33% contingent fee paid to WLG. Under the Funding Agreement, half of the $2,511.88, or approximately $1,250.00 was due to Pravati on February 28, 2019. As noted in paragraph 16 above, in July 2019, after being served with a default notice, Williams informed Pravati for the first time that the Brown case settled.

31.    Other account activity also suggests that WLG had income that was not reported, and that 50% of which was not remitted to Pravati as required. The July 2019 WLG operating bank account

---

[7] In 2017 WLG received fee income in all months except November and December, which coincides with when Williams's initial discussions with Pravati for funding stopped abruptly. This also coincides with the date of Williams's November 3, 2017 arrest for trespassing, for which the charge remained pending until its disposition on January 22, 2018, which would explain the absence of any income to WLG during November and December 2017, if its principal was unable to work his cases and negotiate settlements.

statement shows a starting balance of $183.00 and an ending balance of $94.60.  It also reflects that from July 1 – 11, 2019, $6,500.00 was transferred from the IOLTA account to the WLG Operating account. These transfers were made prior to the issuance of Pravati's default letters to WLG and Williams, and at the time of these transfers no payments were made to Pravati.  After the default letters were issued, an additional $550.00 was transferred from the IOLTA account to the operating account, and two additional transfers from the IOLTA account to the operating account were made on July 24, 2019, in the amounts of $1,666.66 and $1,250.00, which correspond with the two payments made to Pravati in late July 2019.  The account activity shows that in July 2019, WLG received $7,400 of funds transferred from the IOLTA account into the operating account, while a total of only $2916.66 was remitted to Pravati.   During July 2019, a total of $6,540.00 was transferred out of the WLG operating account:  $5,090.00 to Chase Bank Account No. XXXX 215 and $1,450 to the Williams Marketing Group Bank Account No. XXXX 815.

32.    WLG did not remit any payment to Pravati from November 2018 through July 2019.  It reported on a few settlements and remitted payment only after WLG and Williams were served with formal notice of default, resulting in the payments made to Pravati on July 29 and August 12, 2019.  Again, after it sent the August 5, 2019 checks to Pravati, WLG made no payments to Pravati until January 2020, when it was somewhat desperately seeking additional funding from Pravati.  The timing of these events and these payments are not coincidental.  As set forth in Pravati's post-hearing memorandum, there are cases identified on WLG's case list in which notices of settlement or other court filings of public record show that the case settled.  Yet, WLG did not remit to Pravati 50% of the fee it received in connection with those cases.

33.    The foregoing findings support a reasonable inference that WLG received more than $33,333.30 in fee income from December 2018 through December 2019.[8]   Accordingly, it is found by a

_____

[8] Alternatively, the evidence also permits an inference that the $150,000 delivered to WLG's operating account, but promptly moved from that account within weeks, was never deployed by WLG for purposes permitted by the Funding Agreement, but instead the funds were moved among and between the undisclosed "related accounts" and used by WLG and Williams for monthly expenses and expenses of daily living.  That would explain how in the absence of receiving fees for legal work, WLG and Williams could pay the expenses and cover the withdrawals made from those accounts.  In that case, the conduct also establishes a breach of contract and, as discussed below, conversion of the funds.  Because of Respondents' conduct and refusal to respond to discovery in this arbitration, Claimant's motion for sanctions was granted and permitted adverse inferences to be drawn from the limited evidence presented, the absence of available evidence that Respondents have concealed or refused to produce (such as missing

preponderance of the evidence that WLG did not timely remit payment to Pravati as required by the Funding Agreement, and did not remit payment to Pravati for all of the fees and income it received subject to its payment obligation to Pravati under the Funding Agreement.

34.    In addition to the foregoing, the evidence establishes that Respondents breached or were in default of the Funding Agreement in other respects. For example, the failure of WLG to provide material information about a case or about any of its attorneys that could have an adverse effect on the outcome of any case is defined as a "default" in paragraph 2. Williams communicated to Pravati in December 2019 that earlier in the year he was not able to provide reporting or remit payment timely because he was busy with medical appointment due to a concern that he had lung cancer. Assuming the truth of those assertions by Williams, his failure to report that serious health issued, especially when he admitted that it interfered with his ability to meet his obligations, was an event of default.

35.    The Schedule A of the Funding Agreement incorporates the Term Sheet, which provides:

> in the event of an uncured default by Law Firm, the Outstanding Amount will immediately convert from a Nonrecourse Advance to a Recourse Loan. Repayment will be 100% of all recoveries on Law Firm's Cases and against all other assets of Law Firm until Funder is repaid ("Recourse Loan"). Funder will be granted a Security Interest in all of Law Firm's Assets. As further security, and in addition to the recoveries set forth above and any rights provided under applicable law, in the event of an uncured default by Law Firm, Funder shall look to the Andrew Williams, as guarantor, pursuant to this Term Sheet, the Legal Funding Contract & Security Agreement.

36.    Pursuant to Schedule E to the Funding Agreement, Williams agreed to guarantee and pay the obligations of WLG due and owing under the Funding Agreement if WLG fails to pay such obligations. It is found that Williams failed to meet his obligations under the Schedule E of the Funding

---

IOLTA statements, other bank statements, contingent fee agreements with WLG clients, by way of example) and the obstructionist conduct itself. Presumably, if the documents sought by Claimant in discovery would not have been harmful to Respondents, or supported their defense, Respondents would have produced them. Accordingly, it is fair to presume that the documents that Respondents refused to provide to Claimant under the Funding Agreement and in discovery in this matter would have supported Claimant's claims and/or been adverse to Respondents. It is inferred that the missing documents would have shown that WLG failed to remit fee income to Pravati and/or that the $150,000 wire transferred by Pravati was misused by Respondents, as suggested by debits and charges on the operating account bank statements for what appears to be, by way of example, vacation travel, frequent Lyft transportation charges at 2:00 and 4:00 a.m. on Saturday and Sunday mornings, food, clothing and other personal items. These inferences are reasonable under the circumstances and provide an additional independent basis to establish Pravati's breach of contract and conversion claims.

Agreement, and breached the Limited Guarantee Agreement, attached as Schedule "E" to the Funding Agreement.

37.     As a result of the forgoing breaches, Pravati has been damaged by being deprived of the monies to which it is entitled under the Funding Agreement and Guarantee.  The evidence establishes that as of November 2, 2020, the indebtedness owed by WLG to Pravati, and guaranteed by Williams is $186,132.35.

Breach of the Covenant of Good Faith and Fair Dealing

38.     The law implies a covenant of good faith and fair dealing in every contract. *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 383 (1985). The duty arises by virtue of a contractual relationship. The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship. *Id.* The implied covenant of good faith and fair dealing, requires parties to a contract to refrain from any action which would impair the benefits which the other had the right to expect from the contract or the contractual relationship. *Rawlings v. Apodaca*, 151 Ariz. 149, 154 (1986). "[T]he relevant inquiry always will focus on the contract itself, to determine what the parties did agree to." *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (Ariz. 1986).

39.     The undersigned does not find that WLG breached the covenant of good faith and fair dealing because the conduct of WLG and its principal, Williams, constituted breaches of the express contract terms and obligations of the Funding Agreement.  In order to state a claim for breach of the covenant, there must be evidence of conduct that is not contractually prohibited and does not constitute a violation or breach of an express provision or obligation of the contract, but conduct that undermines or prevents the other contracting party's ability to obtain the benefit of the bargain. The undersigned does not consider the mishandling of client cases by Williams or WLG to be a violation of the covenant of good faith and fair dealing as argued by Pravati. By handling cases poorly and missing court appearances, Respondents are harming their own interests as much, if not more, than the harm effected to Pravati's interests under the Funding Agreement and are more likely in violation of their obligation to their clients and/or in breach of ethical rules and standards that govern their conduct.

Conversion

40.     Conversion is defined as "any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Shartzer v. Ulmer*, 85 Ariz. 179, 184 (1959);

*Case Corp. v. Gehrke*, 208 Ariz. 140, 143, ¶ 11 (App. 2004) ("Conversion is defined as an act of wrongful dominion or control over personal property in denial of or inconsistent with the rights of another."). Money can only be the subject of a conversion claim if the money itself "can be described, identified or segregated, and an obligation to treat it in a specific manner is established." *Id.*, quoting, *Autoville, Inc. v. Friedman*, 20 Ariz. App. 89, 91 (1973). "[C]onversion does not lie to enforce the mere obligation to pay a debt which may be discharged by the payment of money generally." *Autoville*, 20 Ariz. App. at 92. Accordingly, to establish a conversion claim in connection with the recovery of funds, the claimant must have a possessory interest in identified funds held by the defendant, which are to be treated in a specific manner.

41.     Under these facts, Pravati does have a possessory interest in the specific funds that WLG receives as payment of its fees.  Independent of any claim for breach of contract, the Funding Agreement vests in Pravati specific rights in and to its 50% share of the fees paid to WLG by its clients.  Upon WLG's entitlement to the fees paid to it in connection with the resolution of a litigation case, Pravati has protected legal rights to 50% of those fees pursuant to the Funding Agreement.  Pravati had a vested interest in 50% of the specific fee received by WLG, secured by lien, pursuant to the Funding Agreement.  WLG's failure to remit those funds to Pravati and its continued exertion of control over those funds constituted conversion.  This is not a case of a debt owed to be collected from any funds held by the other party.  Prior to Respondents' defaults, Pravati was entitled only to 50% of those specific funds received by WLG as fee income, and there is specificity and about Pravati's right and interest in each and every fee paid to the WLG for legal services rendered.  It is found that the conversion of Pravati's secured interest in 50% the funds paid to WLG for legal services was done knowingly and intentionally by WLG and its principal, Williams.  As a result of the tortious conduct of WLG and its principal, Williams exercising dominion and control Pravati's funds, Pravati has been damaged in the amount of $186,132.35.

Unjust Enrichment

42.     To establish a claim for unjust enrichment there must be: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) the absence of justification for the enrichment and the impoverishment; and (5) the absence of a legal remedy. *Wang Elec., Inc. v. Smoke Tree Resort, LLC*, 230 Ariz. 314, 318, ¶ 10 (App. 2012).  A claimant may plead in the alternative, but may not recover on claims for both breach of contract and unjust enrichment, because no

15

cause of action for unjust enrichment will lie when there is a specific contract that governs the relationship of the parties and from which the aggrieved party has a cause of action for the same relief sought by a claim for unjust enrichment. *Brooks v. Valley Nat. Bank,* 113 Ariz. 169, 174 (1976). In this case, Pravati has a legal remedy because as found above, there is an enforceable contractual agreement between the parties regarding the identical matter on which the unjust enrichment claim is based. Consequently, an action for unjust enrichment is precluded under these facts.

Fraud

43.     Fraud must be established by clear and convincing evidence. *Enyart v. Transamerica Ins. Co.,* 195 Ariz. 71, 77, ¶ 18 (App. 1998).   To establish fraud the following nine elements must be shown: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the right to rely on it; (9) his consequent and proximate injury. *Nielson v. Flashberg*, 101 Ariz. 335 (1966). Each element must be supported by sufficient evidence. "Fraud may never be established by doubtful, vague, speculative, or inconclusive evidence." *In re McDonnell's Estate*, 65 Ariz. 248, 253, (1947); *Fridenmaker v. Valley National Bank of Arizona*, 23 Ariz.App. 565 (1975).   For the reasons discussed below, the evidence is not sufficient to meet the burden of proof by clear and convincing evidence as to all nine elements of fraud.

44.     Pravati's fraud claim is based upon the incomplete and inaccurate portrayal of WLG's cases in the case lists provided to Pravati, Williams failure to disclose to Pravati his arrest in 2017 on misdemeanor criminal charges and the disposition of the matter, and Williams misleading statement to Pravati about why their 2017 discussions stopped abruptly and then resumed in mid-2018.    Pravati was provided with a case list dated as of July 2018. The same list was attached to the Funding Agreement, and states expressly that it does not include all cases being handled by WLG. Accordingly, there could be no misrepresentation that Pravati understood the case list provided was complete. There is no question that WLG could have been more detailed and precise with the information included in the case list.  However, Pravati's arguments about the "Cadavid" case, and other cases that were portrayed as being strong and had a high settlement value but were, in fact, in jeopardy of being dismissed with prejudice or resulting in no recovery, do not meet the standard for establishing fraud.  There is a degree of subjective judgment in how

16

an attorney may view or describe the posture and potential outcome of a pending or prospective litigation. The Cadavid case was listed by WLG as "in litigation" when in fact it had been dismissed as of July 2018. However, Williams continued to represent the client and refiled the case, such that it was "in litigation" at a later date.   The description of the Cadavid case as "in litigation" was misleading, but not material because the dismissal was apparently without prejudice and ultimately the case was back in litigation. Also, the Cadavid case was represented as having a potential recovery of $50,000, in a list of cases purportedly valued in the millions.  It appears that many of the cases lists by Williams did not result in outcomes or recoveries as projected on the case list prepared by WLG, but that is not sufficient to establish that the list was prepared with knowledge that the values were unreasonably inflated with the intent to deceive.  The exaggerated valuation of the cases can also be the result of a negligent or innocent misrepresentation, explained by the inexperience, poor judgment or lack of legal ability of the person preparing the list, as opposed to an intent to deceive.

45.     Viewing the evidence in its entirely, there is good reason to concluded that Respondents knew that there was no reasonable factual basis to value the WLG cases listed in July 2018 as over $5,000,000.   The evidence established that Pravati did its own due diligence and a "deep dive" before entering into the Funding Agreement, in addition to obtaining more information from Respondents through discussion.  However, there was no evidence presented about what information Pravati knew or learned in the due diligence process or what other information was imparted by Respondents in the course of negotiations and due diligence. The testimony does not establish that Pravati rightfully relied upon the case list alone, to the exclusion of other information it obtained or received.

46.     Based upon the evidence, as well as the conduct of Respondents in the course of these proceedings, there is evidence of dishonesty and a pattern of using deception to excuse obligations, achieve delay and/or avoid responsibility.  However, fraud in the inducement of an agreement, cannot be based upon anything less than one or more specific material misrepresentations of fact (not matters subject to subjective judgment) or the omission of material facts, that were rightfully relied upon by Pravati.

47.     Finally, based upon the testimony of Hoyt Neal, a Pravati analyst and underwriter, Williams's failure to disclose his November 2017 arrest would not necessarily be a basis for a claim of fraud. Neal explained on cross-examination that Pravati would find it important to know if a partner of a law firm to which it was making a loan was arrested on a criminal charge, but it would explore the details

17

and circumstances surrounding the arrest before determining if the incident would preclude entering into a funding arrangement with that law firm.   He agreed that if the past criminal conduct was a one-time occurrence and was resolved fully, it would probably not prevent Pravati from moving forward with a loan. From the evidence provided, it appears that Williams's November 2017 misdemeanor arrest was resolved by January 2018, several months before Williams re-approached Pravati for a loan.   There was no evidence presented that the Florida or California bars took any disciplinary action against Williams for that arrest, or that any disciplinary proceedings were pending.   Finally, Neal did not testify that based upon the information Pravati learned more recently about Williams arrest in November 2017, Pravati would have definitely not entered into the Funding Agreement with WLG.

48.     Claimant has not met its burden of proof to establish the elements of its claim for fraud.

Damages

49.     Pravati established that it has been damaged in the amount of the outstanding unpaid balance of the total $216,300.00 funded by Pravati to WLG under the terms of the Funding Agreement, plus interest and fees as provided by the Funding Agreement, which as of November 2, 2020, was $186,132.35.   As a result of the breach of the Funding Agreement by WLG, Williams's breach of the Guaranty, and the Respondents' conversion of Claimant's secured interests in fee income received by WLG, Claimant is entitled to damages in the amount of $186,132.35.

Punitive Damages

50.     "To recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant engaged in aggravated and outrageous conduct with an 'evil mind.'" *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 132 (App. 1995). "A defendant acts with the requisite evil mind when he intends to injure or defraud, or deliberately interferes with the rights of others . . . ." Id. "This court must affirm [an] . . . award of punitive damages if any reasonable view of the evidence would satisfy the clear and convincing standard." *Id.*

> In determining whether the amount of punitive damages awarded is proper, this court examines: (1) the proportionality of the award to the wrongdoer's financial position to ensure that the goals of punishment and deterrence are served without financially devastating the defendant; (2) the reprehensibility of the defendant's conduct, including the duration of the misconduct, the defendant's awareness of the risk of harm, and any concealment; and (3) the profitability to the defendant of the wrongful conduct.

*Id.* at 134.

18

51.     It is found that WLG and Williams actively concealed the from Pravati, the resolution and status of WLG cases by avoiding and delaying communication with Pravati, including the use deceit, to commit conversion of Pravati's property interest in its portion of the fee income received by WLG. The Respondents' conduct was a knowing and intentional interference with the property rights of Pravati. WLG and Williams not only converted the funds in which Pravati had a lien and a secured interest, but then proceeded to dissipate those funds for the exclusive use and benefit of the Respondents, effectively destroying Pravati's property interest.  Accordingly, it is found that there is clear and convincing evidence that Respondents' conduct and use of deceit and delay relating to and in its performance of its obligation under the Funding Agreement, in the conversion of Pravati's property interests and throughout the course of this arbitration proceeding, supports the imposition of punitive damages jointly and severally against WLG and Williams.

52.     Based upon the value of the amount in controversy, the type and duration of the conduct by the Respondents, as well as the bank statements and financial documents that reflect the assets and resources of the WLG, in evidence, the undersigned awards punitive damages in the total amount of $10,000 jointly and severally against WLG and Williams.

Costs and Attorneys Fees

53.     Pursuant to the arbitration provision in the Funding Agreement, at page 13 paragraph 21(f), "[t]he arbitrator shall have the authority to assess liability for pre-award and post-award interest on the claims, attorneys' fees, expert witness fees and all other expenses of arbitration as such arbitrator shall deem appropriate based on the outcome of the claims arbitrated."

54.     Based on the foregoing, as the prevailing party Claimant is awarded recovery of its administrative fees of the American Arbitration Association and the arbitrator compensation, which amounts shall be determined and set forth in the Final Award.

55.     As authorized by Funding Agreement and Arizona law, the undersigned will entertain a petition for an award of attorneys' fees, and Claimant is hereby granted leave to submit, within ten (10) judicial days of the date of this Interim Award, a petition for attorneys' fees that contains case law citations to legal authority supporting Claimant's entitlement to an award of attorneys fee in this matter and adequate supporting documentation of the fees charged and paid in connection with this arbitration. Respondents will have ten judicial days after the filing of any petition for attorneys' fee to file a

memorandum opposition to the attorney fee petition.  No reply memorandum is to be filed.

56.     Claimant is awarded pre- and post- judgment interest on the amounts awarded herein pursuant to A.R.S. § 44-1201, and paragraph 13 of the Funding Agreement.

57.     To the extent not otherwise addressed expressly in the forgoing Interim Award, or in an Order issued in this Arbitration, any other request for relief, motion, objection or other matter is hereby denied.  All claims not expressly granted, are hereby denied.

**This Award shall remain in full force and effect until such time as a final Award is rendered.**

_3/29/2021_
Date

Janet S. Weinstein
Arbitrator